[No. 22863-3-I. Division One. July 30, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. IVAN C. CLEVELAND, *Appellant.*

---

*James E. Lobsenz,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

SCHOLFIELD, J.—On June 11 and July 23, 1985, a fact–finding trial was held on a petition for dependency of 8–year–old K., the defendant's stepdaughter. The basis for the claimed dependency was the allegation that defendant, Ivan Cleveland, had sexually abused K. and that Mrs. Cleveland, K.'s mother and Cleveland's wife, would not order Cleveland to live elsewhere. The trial court found that the State had not shown by a preponderance of the evidence that the alleged sexual abuse had occurred and dismissed the petition.

Before the dependency hearing was completed, Cleveland was charged with statutory rape and indecent liberties. Upon dismissal of the dependency petition, Cleveland moved for dismissal of the criminal charges on collateral estoppel grounds, asserting that the criminal charges were based on allegations of sexual abuse of K. that were identical to those allegations heard and dismissed in the dependency proceedings. The trial court denied the motion to dismiss, and Cleveland was convicted by a jury of indecent liberties and attempted statutory rape.

Cleveland appeals, asserting that the prosecution is barred by the doctrine of collateral estoppel, and asserting error in the admission of expert testimony and improper closing argument by the deputy prosecuting attorney. We affirm.

## DEPENDENCY FACT–FINDING HEARINGS

At the time of the dependency hearings, RCW 9A.44.120, our child hearsay statute, did not apply to dependency proceedings. At the dependency hearing, K. testified that Cleveland had touched her private spot with his finger and his private part. She described the occasions when this occurred. K. testified she told her mother about it, but her mother did not believe her. K. said she also told a Child Protective Services caseworker, Vickie Springer, and others.

Cleveland testified and flatly denied ever abusing K. in any way. Mrs. Cleveland testified K. had never reported her claim of sexual abuse to her. She said K. did not always tell the truth and that she did not believe K.'s accusations. Other witnesses testified, but evidence of K.'s statements to them was excluded as hearsay. The trial court found the evidence insufficient to prove sexual abuse and dismissed the petition. It is undisputed that the dependency petition was based entirely on allegations by K. of sexual abuse by Cleveland.

### EVIDENCE AT TRIAL

At trial, K. testified Cleveland had rubbed her "private parts" with his finger. She said he had not touched her bare skin, nor touched her in any other way. She denied any penetration and said she could not recall specific occasions when sexual abuse occurred.

Detective Marsh testified pursuant to the child hearsay statute to statements made to him by K. describing three specific instances of sexual abuse. Several of K.'s school friends, the school nurse, two teachers, the caseworker, and the foster mother all testified to statements made to them by K. reporting sexual abuse by Cleveland.

Barbara Huffman, a family therapist, testified as an expert witness concerning characteristics and typical responses of child victims of sexual abuse.[1] The testimony of Cleveland and Mrs. Cleveland was very similar to their testimony in the dependency hearings.

### COLLATERAL ESTOPPEL

Should an issue decided adversely to the State in a dependency hearing estop the State from trying the same issue in a subsequent criminal trial? We proceed on the basis that the issue in both cases is the same. Did Cleveland sexually abuse his stepdaughter K.? There was no other basis for the claim of dependency, and the jury obviously

---

[1]Huffman's testimony is the subject of a separate assignment of error and will be described in greater detail later in this opinion.

638

answered the question in the affirmative in the criminal trial. Collateral estoppel

is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer,* 242 U. S. 85[, 61 L. Ed. 161, 37 S. Ct. 68 (1916)].

*Ashe v. Swenson,* 397 U.S. 436, 443, 25 L. Ed. 2d 469, 90 S. Ct. 1189 (1970).

In *Yates v. United States,* 354 U.S. 298, 1 L. Ed. 2d 1356, 77 S. Ct. 1064 (1957), the Court stated that collateral estoppel applies to a subsequent criminal prosecution, even if the issue involved was decided in a prior civil action:

We are in agreement with petitioner that the doctrine of collateral estoppel is not made inapplicable by the fact that this is a criminal case, whereas the prior proceedings were civil in character. *United States v. Oppenheimer,* 242 U. S. 85[, 61 L. Ed. 161, 37 S. Ct. 68 (1916)].

*Yates,* at 335.

In *Ashe v. Swenson, supra,* the United States Supreme Court determined that the constitutional basis for the doctrine of collateral estoppel was embodied in the Fifth Amendment guaranty against double jeopardy. In that case, the Court held that in a multiple victim situation, where a man was acquitted of the robbery of one victim due to insufficiency of identity evidence, he could not then be prosecuted for the robbery of a different victim. *Ashe,* at 446.

The doctrine of collateral estoppel had long been the rule in federal criminal cases. The effect of *Ashe v. Swenson, supra,* was that the rule was now applicable in state criminal cases, since *Benton v. Maryland,* 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969) had made the double jeopardy clause applicable to the States. In its analysis, the *Ashe* Court noted that it had not previously ruled that collateral estoppel was of constitutional dimensions because in

the past there were few situations in which the need might arise, especially since a single course of conduct would more than likely yield only one charge. *Ashe,* at 445 n.10.

The Court went on to allude to the distinction between double jeopardy and collateral estoppel by recognizing that strict application of the concept of double jeopardy would not preclude the State from charging Ashe with six separate offenses, corresponding to the robbery of the six victims. Additionally, if Ashe had been convicted of all six counts, he could have received a total of six sentences for his crimes. However, because the only issue at trial was the identity of the robbers, collateral estoppel precluded the relitigation of that issue once it was decided in the initial trial.

Washington law is in accord. *See Henderson v. Bardahl Int'l Corp.,* 72 Wn.2d 109, 431 P.2d 961 (1967). In *Beagles v. Seattle–First Nat'l Bank,* 25 Wn. App. 925, 929, 610 P.2d 962 (1980), the Court of Appeals stated the requirements for application of the doctrine of collateral estoppel as follows:

> The modern requirements for application of the doctrine are: (1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (4) application of the doctrine must not work an injustice.

■ Applying the four requirements of collateral estoppel to the facts of the case before us, we conclude that the first three are here satisfied. It is undisputed that the issue resolved in Cleveland's favor in the dependency hearing was identical to the issue on which he was convicted in the criminal proceeding. That issue was sexual abuse of his stepdaughter K. There is also no question but that the dependency proceeding ended in a final judgment on the merits. The party against whom the plea of collateral estoppel is asserted is the State of Washington in both cases. It is immaterial that in the dependency proceeding,

the State was represented by the Attorney General and in the criminal prosecution was represented by the county prosecuting attorney. *State v. Dupard,* 93 Wn.2d 268, 609 P.2d 961 (1980).

The last requirement for the application of collateral estoppel is one of public policy: whether the doctrine's application would work an injustice. In *State v. Dupard, supra,* the Supreme Court addressed the issue of whether a determination by the Board of Prison Terms and Paroles that Dupard was not guilty of an offense, which would have constituted a parole violation, estopped the State from prosecuting Dupard for the same alleged offense in a criminal proceeding.

The *Dupard* court held that estoppel did not apply, stating that the doctrine of collateral estoppel can be qualified or rejected when its application would contravene public policy. As a general proposition, the issue of whether a parolee had committed a new and separate offense was "more appropriately addressed to the criminal justice system." *Dupard,* at 276. The court's ultimate conclusion was that practical public policy required that when new criminal matters were charged in the criminal justice system, they must be decided there unhampered by parallel proceedings before the Board of Prison Terms and Paroles. On that basis, collateral estoppel was rejected.

However, in *State v. Harris,* 78 Wn.2d 894, 480 P.2d 484, *rev'd per curiam,* 404 U.S. 55, 30 L. Ed. 2d 212, 92 S. Ct. 183 (1971), the defendant was charged with sending a letter bomb that injured his estranged wife, killed her infant son, and killed her lover. Harris was tried first for the murder of the lover, and certain evidence involving a threatening letter to the wife was excluded based on the marital privilege. Harris was acquitted.

The State then proceeded to prosecute Harris for the death of the child and the assault upon his wife. The threatening letter was apparently admissible in that prosecution. The Washington State Court of Appeals in *State v.*

*Harris,* 2 Wn. App. 272, 469 P.2d 937 (1970), granted Harris' motion for a writ of prohibition. In its opinion, the Court of Appeals stated that:

> because the record demonstrates without question that the retrial of petitioner for assault and murder will require relitigation of the same ultimate fact—(did petitioner mail the package containing the explosives?)—we have the view that collateral estoppel applies to prohibit retrial on that issue.

*Harris,* 2 Wn. App. at 291–92. The Court of Appeals also noted that the only additional evidence to be introduced at the second trial was the threatening letter. According to the court, that additional evidence was not "directly germane" to the issue of whether Harris mailed the bomb, but would emphasize his motive to commit the crime. *Harris,* at 291.

The State appealed, and the Washington Supreme Court denied the writ of prohibition and affirmed the trial court. In its opinion, the court noted that:

> Without the presence of harassment, constitutional collateral estoppel posits the familiar question of whether an ultimate fact which must be proved in the second case has already been fully litigated in the first trial. There are two elements in this question: (1) identity of issues, and (2) completeness of the prior litigation.

(Footnote omitted.) *State v. Harris,* 78 Wn.2d at 899.

Although the *State v. Harris, supra,* court acknowledged that there was identity of issue, it held that the issue was not fully contested in the first trial. The opinion stated as follows:

> We are of the opinion that, in cases where evidence is rejected for reasons that have no bearing on the quality of the evidence, the issue on which that evidence bears is not fully litigated. This is to be distinguished from evidence which is rejected on grounds of its irrelevancy, untrustworthiness, or cumulative nature. In such latter instances, the end determination on the particular issue is as fully litigated as proper administration of justice will allow. But there are other instances where, for some reason of policy, the law does *not* completely litigate an issue. We regard the policy which precludes otherwise relevant and competent evidence in certain instances on the grounds of privilege as such a situation. In such cases, collateral estoppel does not preclude subsequent litigation of

the particular issue, since it has not been fully litigated in the first instance.

*State v. Harris,* 78 Wn.2d at 901.

However, on appeal to the United States Supreme Court, *State v. Harris, supra,* was reversed in a short per curiam opinion. The Court stated as follows:

> In *Ashe v. Swenson,* we held that collateral estoppel in criminal trials is an integral part of the protection against double jeopardy guaranteed by the Fifth and Fourteenth Amendments. We said that collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." The State concedes that the ultimate issue of identity was decided by the jury in the first trial. That being so, the constitutional guarantee applies, *irrespective of whether the jury considered all relevant evidence, and irrespective of the good faith of the State in bringing successive prosecutions.*

(Citations omitted. Italics ours.) *Harris v. Washington,* 404 U.S. 55, 56–57, 30 L. Ed. 2d 212, 92 S. Ct. 183 (1971).

■ We do not believe that the United States Supreme Court's decision in *Harris v. Washington, supra,* necessarily means that courts cannot decide to reject the application of the doctrine of collateral estoppel for policy reasons in all cases. Rather, we believe that the *Harris* Court held that mere failure to fully litigate, without something more, is insufficient to reject application of collateral estoppel on policy grounds.

In fact, the United States Supreme Court has itself applied policy considerations in refusing to apply collateral estoppel in a criminal context. In *Standefer v. United States,* 447 U.S. 10, 64 L. Ed. 2d 689, 100 S. Ct. 1999 (1980), an accomplice sought dismissal of the prosecution against him after the principal was acquitted. The principal, Niederberger, was an IRS agent accused of accepting compensation from Standefer in the form of payments for vacations taken, in violation of 26 U.S.C. § 7214. The *Standefer* Court refused to apply collateral estoppel to Niederberger's jury acquittals.

The Court noted that the doctrine arose in the context of civil cases, as a way to promote judicial economy and to conserve private resources, without being unfair to the litigant against whom the estoppel is invoked. *Standefer,* at 21. The *Standefer* Court stated that the considerations in the criminal context differ significantly from the civil situation, in that the government is often without a full and fair opportunity to litigate because of discovery limitations, the lack of remedial appellate procedures if a defendant is acquitted, and the exclusionary rule.

In addition, jury verdicts may be the result of passion or prejudice, and as such, without remedial appellate procedures (the State may not appeal an acquittal), collateral estoppel should not apply when the criminal defendant in the first proceeding was not the same defendant seeking the protection of collateral estoppel in the second proceeding. *Standefer,* at 23–24.

It may be a fair question as to whether nonmutual collateral estoppel should be applied to the case before us, given that, as K.'s stepfather, Cleveland was not a party to the dependency proceeding. Because our decision here is based on separate policy considerations, we do not decide that issue. However, we note that the unusual circumstances here differ from those present in *Standefer,* because although Cleveland was not a party to the dependency proceeding, the only issue there concerned Cleveland's conduct—whether he had sexually abused K. Therefore, unlike *Standefer,* which dealt with another party's activities, the case before us concerned only Cleveland in both proceedings.

As noted above, we find overall considerations of public policy are determinative of the question before us. Dependency proceedings are often attended with a sense of urgency, are held as promptly as reasonably possible, and the entire focus of the proceeding is the welfare of the child. The focus being more narrow than in a typical felony trial, the State normally does not need, nor does it perform,

the extensive preparation typically required for felony trials.

Furthermore, the prosecutor uses many more resources in developing a felony prosecution than those available and used in the typical dependency hearing. Dependency is decided by a judge, while felony trials are usually tried to a jury. In addition, if the State was faced with application of the doctrine of collateral estoppel to findings in dependency proceedings, there could well be a reluctance to conduct dependency proceedings in cases where one or more of the same issues would arise in subsequent criminal prosecutions. While the welfare of minor children is undeniably important, we are influenced by the desirability of not impeding enforcement of the criminal law when no overriding consideration requires it.[2]

The trial court did not err in rejecting Cleveland's motion to dismiss based upon the application of the doctrine of collateral estoppel.

## TESTIMONY OF BARBARA HUFFMAN

Barbara Huffman is a child and family therapist at Luther Child Center in Everett. Acknowledging there were inconsistencies in K.'s testimony, the State presented expert testimony from Huffman regarding typical behavior of child victims of sexual abuse. This testimony was offered to aid the jury in evaluating the testimony of K. Huffman's work is primarily with sexually abused children. She has a master's degree in education and child development and also a master's degree in social work, and has worked with at least 80 child victims of sexual abuse. She stated these were cases where the abuse had been verified—usually by admission of the offender.

Huffman testified it was not unusual for a child sex abuse victim to be reluctant to tell about it. She based that answer on her own observations and experience and stated

---

[2]We are aware that *Lockwood v. Superior Court*, 160 Cal. App. 3d 667, 206 Cal. Rptr. 785 (1984) supports Cleveland's position here. We are satisfied, however, that our public policy concerns are sound.

some reasons for the testimonial reluctance of children. Huffman said it was common for the abused child not to tell the full story initially and to add or subtract facts as the events were retold. Extensive explanatory reasons for this conduct were also related. While Huffman's testimony was based on her own experience, she testified her experience was consistent with the experience of other experts in the field. The trial court sustained an objection to testimony that recanting of claims of sexual abuse was also not unusual.

Cleveland argues that there was no evidence that characteristics of child victims of sexual abuse is a generally accepted method for determining whether sexual abuse had occurred in a particular case. In making this argument, Cleveland cites *State v. Black,* 109 Wn.2d 336, 745 P.2d 12 (1987). In *Black,* the expert testified in part: "There is a specific profile for rape victims and [the victim] fits in." (Italics omitted.) *Black,* at 339. The basis for this statement was described by the witness as the "rape trauma syndrome." *Black,* at 339.

The issue in *Black* was whether or not the sexual intercourse was consensual. The testimony of the expert amounted to an opinion that, indeed, the intercourse was not consensual and that a rape had occurred. The opinion in *Black* appears to hold that the substance of the expert testimony was an opinion that the defendant was guilty and was inadmissible for that reason. *Black,* at 348. The *Black* opinion also holds that "rape trauma syndrome" is not a scientifically reliable means of proving lack of consent in a rape case.

However, in *State v. Ciskie,* 110 Wn.2d 263, 751 P.2d 1165 (1988), the Washington Supreme Court approved the admission in a rape trial of expert testimony on "battered woman syndrome" to assist the jury in understanding the victim's delays in reporting the alleged sexual assaults and for continuing the battering relationship. Although the trial court permitted testimony regarding "battered woman syndrome" for this purpose, the court excluded testimony from

the expert to the effect that the alleged victim had been diagnosed as a rape victim. *Ciskie,* at 272.

The *Ciskie* court stated as follows:

> [The expert's opinion was that] the failure of the woman . . . to report the sexual assaults . . . was characteristic of a person suffering from the battered woman syndrome. This testimony was helpful to the jury's understanding of a matter outside the competence of an ordinary lay person, and the trial court limited the admission of that testimony to its appropriate purpose.
>
> Although [the expert's] testimony clearly satisfied the requirements of ER 702, the trial court had the discretion under ER 403 to exclude the evidence if he found a danger of unfair prejudice. The trial court properly found that there was danger of such prejudice if [the expert] were to present to the jury a diagnosis of [the victim] as a rape victim, and accordingly barred such testimony.

*Ciskie,* at 279.

■ The case sub judice more closely resembles *Ciskie* than *Black*. Huffman's testimony did not espouse a theory proving guilt. In fact, her testimony was really not an explanatory theory or opinion requiring acceptance by the scientific community by ER 702.[3] Huffman's testimony was essentially a description of her personal observations of some of the characteristics of child sex abuse victims. Her observations are comparable to testimony of a physician describing characteristics he has personally observed in his treatment of a particular injury or disease. Huffman did not at any time offer an opinion that K. was a victim of sexual abuse. Nor did she ever say the testimonial deficits she described were limited to child victims of sexual abuse. Huffman did not imply, as Cleveland argues, that Cleveland was guilty of the acts attributed to him by K. Nor did she ever say or imply that K. was telling the truth.

The basis of ER 702, at least in part, is the ruling in *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C.

---

[3]ER 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Cir. 1923), which rejected a "systolic blood pressure deception test" on the ground it had not yet gained recognition by the scientific community. The difference between such scientific testing and an expert testifying to facts based upon her own observations is clear. The court did not err in admitting Huffman's testimony.

### PROSECUTORIAL MISCONDUCT

In rebuttal closing argument, the prosecutor argued as follows:

> None of the people who testified here have any interest in trying to create a case of sexual abuse where none exists. Mr. Cleveland was given a chance to present any and all evidence that he felt would help you decide. He has a good defense attorney, and you can bet your bottom dollar that Mr. Jones would not have overlooked any opportunity to present admissible, helpful evidence to you.

Defense counsel objected, but was overruled. Cleveland assigns this ruling as error.

In *State v. Traweek*, 43 Wn. App. 99, 715 P.2d 1148 (1986), the prosecutor commented in closing argument as follows:

> Mr. Traweek doesn't have to take the stand and you can't hold that against him. That doesn't mean the defense counsel can't put other witnesses on if they have explanations for any of these questions, any of this evidence. Where has it been? Why hasn't it be [*sic*] presented if there are explanations, which there aren't? . . .

*Traweek,* at 106.

The *Traweek* court held that it was error for the prosecutor to comment on the lack of defense evidence because the defendant has no duty to present evidence. Citing *In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970), the *Traweek* court noted that the State bears the whole burden of proving each element of the case beyond a reasonable doubt. *Traweek,* at 107. According to the *Traweek* court, the prosecutor's statement suggested that the defendant was obliged to call witnesses and prove his innocence, if he could, and for that reason was improper. However, the *Traweek* court found any error to be harmless.

■■■ The argument made by the prosecutor in the case before us was not strictly limited to a comment on the State's own evidence. The reference to Cleveland having a good defense attorney who would not overlook any opportunity to present favorable evidence clearly suggests that there is no favorable evidence because Cleveland did not present favorable evidence. The inference from this argument is that Cleveland had a duty to present favorable evidence if it existed. The prosecutor's argument was improper. Counsel's objection should have been sustained, the comment should have been stricken, and the jury admonished to disregard it. Reversal is required unless the error was harmless beyond a reasonable doubt. *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). The trial court's instructions to the jury stated that the State had the burden of proving each element of the crime beyond a reasonable doubt and that a reasonable doubt could arise from evidence or lack of evidence. The instructions thus made it clear to the jury that it could find that there was a reasonable doubt, even in the absence of defense evidence. *See Traweek,* at 108.

The objectionable argument by the prosecutor has virtually no persuasive quality in the context of the facts of this case. It is common knowledge that sexual molestation of a child is not carried on in the presence of other witnesses. Cleveland testified that he was innocent of the accusations made by his stepdaughter K. The prosecutor's argument can only be interpreted as referring to affirmative evidence that Cleveland might discover and present to the court. Where would one in Cleveland's position look for such evidence? It appears to us to be extremely unlikely that the jury could have been influenced in any respect by the improper argument made in this case. It is obvious that in order to convict Cleveland, the jury had to believe some or all of K.'s testimony, either through her own testimony at trial or through proof of statements made by K. outside the courtroom but admissible through the child hearsay statute. The portion of the prosecutor's closing argument

objected to does not bear upon the credibility of K. We are satisfied that the result in this case would have been the same had the portion of the closing argument objected to not been made. Allowing the closing argument to stand was harmless error beyond a reasonable doubt.

Judgment affirmed.

COLEMAN, C.J., and FORREST, J., concur.

Review denied at 115 Wn.2d 1029 (1990).